SKY TECHNOLOGIES, LLC, Plaintiff,

v.

ARIBA, INC., Defendant.

Civil Action No. 06–11889–WGY.

United States District Court,
D. Massachusetts.

June 14, 2007.

Aimee M. Robert, Brian D. Melton, Lexie G. White, Max L. Tribble, Stephen D. Susman, Susman Godfrey L.L.P., Houston, TX, George M. Schwab, Law Offices of George M. Schwab, Mill Valley, CA, William L. Prickett, Erik W. Weibust, Seyfarth Shaw, LLP, Boston, MA, for Plaintiff.

Annette L. Hurst, L.J. Chris Martiniak, Michael P. Wickey, Heller Ehrman LLP, San Francisco, CA, Brian D. Kaider, Heller Ehrman LLP, Washington, DC, Elizabeth S. Pehrson, Heller Ehrman L.L.P., Menlo Park, CA, Geri L. Haight, H. Joseph Hameline, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC, Boston, MA, Wei–Drin Lee, Heller Ehrman LLP, Anchorage, AK, for Defendant.

### MEMORANDUM AND ORDER

YOUNG, District Judge.

## I. INTRODUCTION

Sky Technologies, LLC ("Sky") brings this cause of action against defendant Ariba, Inc. ("Ariba") alleging infringement of U.S. Patent No. 6,141,653 ("the '653 patent"), U.S. Patent No. 7,149,724 ("the '724 patent"), and U.S. Patent No. 7,162,458 ("the '458 patent").[1] Am. Compl. [Doc. No. 37] ¶¶ 16–40. The patents at issue generally involve software that facilitate negotiations over a network.

Ariba denies any infringement and asserts six affirmative defenses. Answer [Doc. No. 38] ¶¶ 16–40, 59–70. In addition, Ariba seeks declaratory judgments of non-infringement, invalidity, and unenforceability. *Id.* ¶¶ 71–84.

The dispute over infringement has been narrowed to focus on claims 1, 4, 20, and 23 of the '653 patent; claims 98, 119, 163, and 170 of the '724 patent; and claims 1 and 16 of the '458 patent. The parties sought claim construction for certain disputed terms. This Court held a *Markman* hearing on May 16, 2007 to construe the disputed terms. *See Markman* Hearing Tr., May 16, 2007 [Doc. No. 63] ("Tr."); *see generally Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). At the *Markman* Hearing, this Court construed all of the disputed terms, but took under advisement the single issue of the role the prosecution history must play in claim construction. This Memorandum and Order sets forth this Court's approach to the use of prosecution history in claim construction and then applies that analytical framework to the claim term that was taken under advisement.

## II. DISCUSSION

### A. The Analytic Framework

Claim construction is the first step in a two-step process to adjudge whether patent infringement occurred. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed.Cir.1998) (en banc). Claim construction is matter of law reserved exclusively for the judge. *Markman*, 52 F.3d at 979. The Federal Circuit, in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed.Cir.2005) (en banc), *cert. denied*, — U.S. ——, 126 S.Ct. 1332, 164 L.Ed.2d 49 (Feb. 21, 2006),

---

**1.** In its complaint, Sky alleged infringement of two additional patents—U.S. Patent No. 6,336,105 ("the '105 patent"), U.S. Patent No. 6,338,050 ("the '050 patent")—but chose not to pursue those claims. Am. Compl. ¶¶ 21–30.

provided an interpretative framework to assist a judge in discharging that role.

■ In *Phillips,* the Federal Circuit began with a recital of the basic principle of claim construction, that "the words of a claim 'are generally given their ordinary and customary meaning.'" *Id.* at 1312 (citing *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996)). The ordinary and customary meaning is one that would be understood as such by "a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313. In divining that meaning, a court must give more weight, perhaps even dispositive weight, to intrinsic evidence—which includes inferences drawn from the full context of the patent, the specifications, and the prosecution history—rather than to extrinsic evidence. *See id.* at 1313–14, 1317–18.

The question raised in this case is not the relative weight of the two categories of evidence, but the weight that a court must accord the prosecution history within the ambit of intrinsic evidence. The court in *Phillips* touched on this question. *See id.* at 1317. While labeling prosecution history intrinsic evidence, the court went on to state that "because the prosecution history represents an ongoing negotiation between the Patent and Trademark Office ('PTO') and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* The prosecution history is most useful to "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* The prosecution history, therefore, may assist a court in the claim construction step of a patent infringement case. *See id.; see also PODS, Inc. v. Porta Stor, Inc.,* 484 F.3d 1359, 1366–67 (Fed.Cir.2007); *Vitronics, Corp.,* 90 F.3d at 1582.

There are two discernable problems with using prosecution history in claim construction. The first is addressed in the *Phillips* decision itself in its discussion of the lack of clarity associated with prosecution history as intrinsic evidence. *Phillips,* 415 F.3d at 1317; *see Inverness Med. Switz. GmbH v. Warner Lambert Co.,* 309 F.3d 1373, 1382 (Fed.Cir.2002) (refusing to limit claims based on ambiguous prosecution history). The broader associated problem is that arguments made during the prosecution history need to be viewed in the context of the full negotiation with the PTO. *See Southwall Techs., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1582 (Fed. Cir.1995) (discussing prosecution history estoppel). Every time prior art is distinguished, that distinction must be considered and understood in conjunction with all other distinctions. *See id.* This context is often lost in the surgical arguments made by counsel during claim construction.

The second problem is perhaps more fundamental. Claim construction is but a preliminary step in adjudicating a patent infringement claim. *See Cybor Corp.,* 138 F.3d at 1454. The court's role at this preliminary stage is solely to define disputed claim terms. *See Southwall Techs., Inc.,* 54 F.3d at 1578. Prosecution history may assist at this stage by illuminating a special or different meaning used by an inventor for a disputed term. *Vitronics, Corp.,* 90 F.3d at 1582. In *Southwall Technologies, Inc.,* the Federal Circuit also noted that prosecution history "limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." 54 F.3d at 1576.

While this language is oft recited as part of the prosecution history's role in claim construction, *see Phillips,* 415 F.3d at 1317 (citing *Southwall Techs., Inc.*), the limiting context of this preliminary inquiry is often ignored, *see Southwall Techs., Inc.,* 54 F.3d at 1578. Specifically, courts often erroneously apply the principles of prosecution history estoppel to claim construction. *See id.* The Federal Circuit, in *Southwall Technologies, Inc.,* recognized such a distinction and held prosecution history estoppel applicable only to attempts by patent holders to recapture, through the doctrine of equivalents, disclaimed or disavowed claim scope. *See id.* "The limit on the range of equivalents that may be accorded a claim due to prosecution history estoppel is simply irrelevant to the interpretation of those claims." *Id.* To do otherwise would give a defendant two bites of the apple, first by using prosecution history to limit the interpretation of disputed terms—thereby increasing the chance of undermining a literal infringement claim—and then, second, using the same prosecution history to restrict the scope of the doctrine of equivalents.

While academically this appears clear cut, the practical application of using prosecution history to limit the interpretation of disputed terms without borrowing principles of prosecution history estoppel proves difficult. The difficulty, however, is overcome by focusing on the key role of prosecution history in claim construction, which is to "inform the meaning of the claim language." *See Phillips,* 415 F.3d at 1317.

Claim construction seeks to give a disputed term its plain meaning as understood by a person of ordinary skill in the art in question. *Id.* at 1312–13. If that meaning is readily apparent from the intrinsic record, then the disputed term may be considered to have only one reasonable interpretation. *See id.* at 1314.

In many cases, however, multiple interpretations of a disputed term are reasonable due to an idiosyncratic use of language. *Id.* The specification remains the most persuasive and reliable evidence of which interpretation is the one understood by a person with ordinary skill in the art. *See id.* at 1315. The prosecution history, where relevant, informs the specification and may, where the specification is silent on a disputed term, contain statements that directly inform the meaning of the term. *See id.* at 1317.

This use of prosecution history differs from the use of prosecution history estoppel because the inquiry is limited to arguments or disavowals made during prosecution regarding the meaning of the disputed claim term. *See Southwall Techs., Inc.,* 54 F.3d at 1576. The court is thus not concerned with the state or scope of the prior art. *See Wang Labs., Inc. v. Mitsubishi Elecs. America, Inc.,* 103 F.3d 1571, 1577–78 (Fed.Cir.1997); *Cole v. Kimberly–Clark Corp.,* 102 F.3d 524, 527 (Fed.Cir.1996) (demonstrating how factual questions often arise in determining how one of ordinary skill in the art would view the distinguishing of prior art). The court is also not concerned with how far the patent or claims as a whole may extend in terms of breadth of subject matter. A court is concerned only with the interpretation of a disputed term.

To this end, the arguments or disavowals in the prosecution history must be deliberate, unambiguous, and explicit. *See Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 452 (Fed.Cir.1985) (requiring such statements to be express representations). As the Federal Circuit said in *Schwing GmbH v. Putzmeister Aktiengesellschaft,* "[a]lthough prosecution history can be a useful tool for interpreting

claim terms, it cannot be used to limit the scope of a claim unless the applicant took a position before the PTO that would lead a competitor to believe that the applicant had disavowed coverage of the relevant subject matter." 305 F.3d 1318, 1324 (Fed.Cir.2002). Additionally, the statements or disavowals must directly address the disputed term. Only where these conditions are met, and where the evidence in the prosecution history does not contradict the language of the claims, is it proper for the court to consider such evidence in determining the correct interpretation. If the locus of the argument does not center on the disputed term, a court will face an ambiguity as to whether the statement or disclaimer affects the inventor's belief in the scope of the disputed term.

For example, in *Purdue Pharma L.P. v. Endo Pharmaceuticals Inc.*, 438 F.3d 1123 (Fed.Cir.2006), the Federal Circuit reviewed a district court's claim construction of the term "controlled release." *Id.* at 1135–36. Although the term had properly been construed as to not contain a limitation regarding dosage, the district court had looked to the prosecution history and found a deliberate surrender of drug formulations outside of a prescribed dosage range. *Id.* at 1136. The Federal Circuit reversed, holding that the disclaimer did not directly address an interpretation of the term "controlled release," but merely distinguished the prior art on the "discovery" of the prescribed dosage range. *See id.* Thus, the disavowal did not unambiguously limit the disputed term. *See id.* The district court erroneously broadened

its consideration of the prosecution history past its preliminary task of interpreting specific claim language. *See id.* at 1136–37 ("Without any specific claim language to interpret, however, the trial court impermissibly imported a limitation into the claims.").

In another case, *PODS, Inc. v. Porta Stor, Inc.*, the Federal Circuit held that a district court erred in not construing the claim term "carrier frame" as requiring a four-sided or rectangular shape. 484 F.3d at 1366–67. In making that determination, the court relied upon a clear disavowal of contrary interpretations when the patent holder stated during the prosecution history that "the [prior art] reference clearly lacks the teachings of the singular *rectangular-shaped* frame." *Id.* at 1368. In that situation, the argument in the prosecution history directly distinguished the prior art due to the term "carrier frame." *See id.* That is, the inventor clearly and deliberately limited the scope of the claim term by this disavowal. *See id.*

## B. Applying the Analytic Framework

Analysis in the instant case thus looks to the prosecution history only for explicit statements or disclaimers directed at the meaning of disputed terms. The Court applies this analysis to the one term [2] that remains under advisement on this ground after this Court's *Markman* hearing. Specifically, this Court must determine whether its construction of the term "automated negotiations engine for analyzing terms" [3] ought be modified to include a limitation

---

**2.** Originally, the term "recognizing any changes in the terms" was also taken under advisement in light of the argument that the prosecution history added the limitation of "prompting." Tr. 34:1–16. The disputed issue was, however, subsequently resolved at the hearing by agreement of the parties. *Id.* at 41:3–42:8.

**3.** This Court construed the disputed term to be: "Special purpose software that performs the functions necessary to implement multiple rounds of bargaining which allows for an offer and multiple counteroffers between two participants where each round is related to prior rounds without human intervention." Tr. 14:20–15:4; 19:4–10.

that "all the terms" be capable of being negotiated as a result of the prosecution history. *See* Tr. 12:14–17.

■ Ariba's argument focuses on an interpretation of the term "analyzing terms." Def. Opening Claim Construction Brief [Doc. No. 44] ("Def.Br.") at 16. As an initial matter, the claim construction of this term likely calls for no further description. *See Phillips*, 415 F.3d at 1312–13. This is not a situation where an inventor used an idiosyncratic term or where the plain meaning of the term is difficult to divine. *See id.* Instead, the choice by the inventor, with the PTO examiner's presumed approval, to use this term without the limiting word "all" ought be controlling for this preliminary step. Ariba attempts to refute this plain meaning by referencing Figure 15b in the '653 patent. Tr. 19:12–18, 20:3–4. Figure 15b, however, presents a typical proposal form for a buyer, but does not speak to a *requirement* that the automated negotiations engine must be capable of analyzing each and every term on that form. *See* Def. Br., Ex. A at Fig. 15b & col. 25, ll. 41–59. Instead, the description in the specification dealing with "iterative multivariate negotiations" supports an interpretation that the proposal form *allows* for the inclusion of all terms (those not specified in fields going into the open text box), but the language does not require analysis of every term. *See id.* at col. 25, ll. 41–59.

Still, Ariba makes the argument that Sky explicitly disavowed any interpretation that fails to include an automated system that analyzes each and every term of the negotiation. *See* Def. Br. at 16; Tr. 17:20–20:7. Specifically, Ariba argues that Sky distinguished the Silverman patent on this basis. Tr. 18:19–3, 20:3–4. The PTO originally rejected the relevant claims in the '653 patent because of the Silverman patent's teaching on a negotiation software using, for example, a "free-style dialog" box. Affidavit of Wei–Drin Lee [Doc. No. 45] ("Lee Aff."), Ex. 4 at 4. The PTO cited to Figure 4 in the Silverman patent, which looks similar to Figure 15b of the '653 patent. *See id.;* Lee Aff., Ex. 5 ("the Silverman patent") at Fig. 4.

Sky amended the claims in the '653 patent to distinguish the Silverman patent by adding the disputed claim language. *See* Lee Aff., Ex. 6 at 2, 33–34; Lee Aff., Ex. 7 at 16–17. The prosecution history reveals, however, no deliberate and express statements or disavowals that supports an interpretation of the claim language "term" to mean "all terms." *See* Lee Aff., Ex. 6 at 2, 33–34; Lee Aff., Ex. 7 at 16–17. Instead, the prosecution history makes clear that the key distinguishing factor was the "automated" nature of the Sky patent's analysis of terms in contrast to the "matching" nature of the Silverman's process. *See* Lee Aff., Ex. 6 at 2, 33–34; Lee Aff., Ex. 7 at 16–17. As a result, the prosecution history fails to counter the plain meaning of the claim language, and this Court's *Markman* hearing claim construction will stand.

## III. CLAIM CONSTRUCTION ORDER

To assist the parties going forward, and with express appreciation to Judge Folsom who has so skillfully ploughed this ground before, Claim Construction Order, *Sky Technologies, Inc. v. IBM, Inc.*, No. 03–00454 (E.D.Tex.) [Doc. No. 194, filed on Sept. 7, 2005], this Court summarizes the claim construction agreed upon or ordered at this Court's May 16, 2007 *Markman* hearing.

### A. "multivariate negotiation system"

As to this term, this Court ordered the following claim construction:

A system of hardware and software that enables participants to perform multiple rounds of bargaining over multiple terms. The multiple rounds of bargain-

ing (i.e., the "negotiation") must allow for an offer and multiple counteroffers between two participants where each round is related to prior rounds and is more than a simple bid submission system.

Tr. 26:11–23; 31:10–17.

### B. "automated negotiations engine for analyzing terms"

As to this term, this Court ordered the following claim construction, which remains unchanged following this Court's analysis of the prosecution history:

Special purpose software that performs the functions necessary to implement multiple rounds of bargaining which allows for an offer and multiple counteroffers between two participants where each round is related to prior rounds without human intervention.

Tr. 14:20–15:4; 19:4–10.

### C. "analysis of terms comprising understanding the purpose of the terms, formatting the terms according to the purpose, and placing them into user supplied context for use by a user"

As to this term, the parties agreed to the following claim construction:

Determining the relationship of terms entered by a user to the negotiation and classifying them accordingly, the automated negotiation engine understands to which category of terms a term entered by a user correlates, the automated negotiations engine arranges the terms according to their category as determined by the automated negotiations engine, the automated negotiations engine puts the formatted terms into a structure defined by or acceptable to the user.

Tr. 23:6–16; 25:23–24.

### D. "during iterative processing"

As to this term, this Court ordered the following claim construction:

The claimed steps can be repeatedly performed by the automated negotiations engine while performing multiple rounds of bargaining involving an offer and multiple counteroffers between two participants where each round is related to prior rounds.

Tr. 26:24–27:8.

### E. "recognizing any changes in the terms"

As to this term, the parties agreed to the following claim construction:

The automated negotiations engine perceives any changes one participant makes to the content or substance of the terms proposed by another participant and can prompt requests or actions in response to such changes if appropriate.

Tr. 5:23–6:10; 41:3–42:7.

### F. "indicating any changes in the terms" / "indicating changes in the terms by storing changed terms in the storage space until a set of terms is acted upon in a final manner by the deciding entity"

As to this term, the parties agreed to the following claim construction:

The automated negotiations engine automatically points out to one participant what the changes are, if any, that have been made by another participant.

Tr. 32:6–33:6.

### G. "sponsorship software which enables the creation of a sponsored community with prescribed rules and procedures for participants"

As to this term, this Court ordered the following claim construction:

Software that permits rules and procedures to be created by a user or a third-party sponsor, which are applicable to a group of participants and provides a facility to conduct negotiations.

Tr. 43:15–18; 44:7–45:9.

### H. "sponsored community with prescribed rules and procedures for participants"

As to this term, this Court ordered the following claim construction:

A group defined by a user or a third-party sponsor, having a facility to conduct negotiations according to prescribed rules and procedures.

Tr. 45:16–20; 48:22–24.

### I. "process mining function for evaluating a process related to such a negotiation" / "evaluating a process related to such a negotiation by using a process mining function"

As to this term, the parties agreed to the following claim construction:

Software for extracting useful information from data collected about a negotiation.

Tr. 8:20–24.

### J. "automated system of record"

As to this term, the parties agreed to the following claim construction:

A system that automatically stores each set of terms proposed at each iteration.

Tr. 9:1–4.

### K. "dynamic manager for transforming rules for governing negotiations into an active template"

As to this term, the parties agreed to the following claim construction:

Software that automatically creates an active template whose fields are based

on the set of rules that govern the negotiation.

Tr. 9:6–9.

### L. "active template containing terms for use during such a negotiation"

As to this term, this Court ordered the following claim construction:

A set of predefined data fields for terms to be negotiated using the automated negotiations engine that is configured so that certain fields can be used automatically by other programs.

Tr. 49:5–11; 51:23–52:3.

SO ORDERED.