In re the SINGER COMPANY
N.V., et al.,

The Singer Company B.V., and Singer
Do Brasil Industria E Comercio
Ltda, Plaintiffs,

v.

Groz Beckert KG and Dyno
Corporation, Defendant.

Bankruptcy Nos. 99–10578 through 99–
10607, 99–10613, 99–10616 through
99–10629, 99–10423.
Adversary No.,00–2685.

United States Bankruptcy Court,
S.D. New York.

May 10, 2001.

Skadden, Arps, Slate, Meagher & Flom LLP (by Esther S. Trakinski, Shmuel Vasser), New York City, for plaintiffs.

Kramer, Levin, Naftalis & Frankel LLP (by Jeffrey Trachtman, Nicholas, L. Coch), New York City, for Groz–Beckert KG.

Greenberg Traurig, LLP (by Barry G. Magidoff), New York City, for Dyno Corporation.

### DECISION ON MOTION AND CROSS MOTION FOR SUMMARY JUDGMENT

BURTON R. LIFLAND, Bankruptcy Judge.

The Singer Company B.V. (Singer B.V.) and Singer do Brasil Industria e Comercio Ltda ("Singer Brasil") (collectively "the Plaintiffs") commenced the instant adversary proceeding against Groz Beckert KG ("Groz") and Dyno Corporation ("Dyno" and together with Groz, "the Defendants"), seeking a judgment (i) declaring that an action commenced by the Defendant Groz in the Southern District of Florida (the "Florida Action") *prior to the effective date of the Debtor's plan of reorganization* violates the automatic stay pursuant to sections 362(a)(1) and (3) of the title 11, United States Code (the "Bankruptcy Code"); (ii) restraining and enjoining the continuation of the Florida Action; and (iii) declaring that Singer Brasil has a valid license in a certain patent (the "330 Patent") that is the subject of the Florida Action. The dispute between the parties centers around the '330 Patent for a sewing machine needle that was issued to the Singer Company ("Singer U.S."). In the Florida Action, Groz seeks to enjoin Dyno, Singer's distributor in the United States, from selling needles produced by Singer Brasil pursuant to the '330 Patent.

On November 3, 2000, this Court granted the Plaintiffs' motion to stay the Florida Action and denied Groz's motion to dismiss this adversary proceeding[1]. Now

---

1. *See Singer B.V. and Singer Brasil v. Groz Beckert et. al (In re Singer Company, N.V.),* Ch. 11 Case No. 99–10578–BRL, Adv. No. 00–2685 (Bankr.S.D.N.Y. November 3, 2000)

before the Court is the Plaintiffs' motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable in this adversary proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for partial summary judgment (i) on the First through and including the Sixth Claims for Relief and (ii) dismissing with prejudice the counterclaim asserted by Groz against Singer Brazil for patent infringement (the "Counterclaim"). Also before the Court is Groz's cross-motion for entry of an order, pursuant to Federal Rules 56(b), (e), and (f), (i) granting Groz summary judgment dismissing the Plaintiffs First and Second claims of relief, (ii) denying the Plaintiffs' motion for partial summary judgment in its entirety, and (iii) in the alternative, denying the Plaintiffs' motion in its entirety pending discovery.

## I. BACKGROUND

The facts are set forth in the Court's prior decision, familiarity with which is assumed. *See Groz I.* However, in the interest of continuity, some restatement of the underlying facts is required.

On September 12 and 13, 1999, the Singer Company N.V. and certain of its affiliates, including the Plaintiffs (collectively the "Company"), filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On August 24, 2000, this Court entered an order confirming the Joint Plan of Reorganization of the Singer Company N.V. and its Affiliated Debtors and Debtors in Possession (the "Plan"). The Plan provided, among other things,

that the automatic stay would remain in effect until the effective date of the Plan which occurred on September 14, 2000 (the "Effective Date"). *See Plan* at Article XV. Both Singer B.V. and Singer Brasil are Reorganized Debtors under the Plan.

## The Patent

In 1983, U.S. Patent Application 566,249 (the "Patent Application"), which describes and claims certain sewing machine needles, was filed in the United States. That same year, Singer U.S.'s Germany subsidiary, Singer Spezialnadelfabrik GmbH ("Singer Germany")[2], sold to Singer Brasil the specially designed equipment[3] for manufacturing the then patent-pending needle (the "Specialized Equipment"). Singer Brasil is the Company's principal operating entity in Brazil, and is one of the Company's two primary manufacturers worldwide of consumer sewing machines.

The United States Patent and Trademark Office issued the '330 Patent, which covers a needle for use in a sewing machine having a one-way needle clamp, to Singer U.S. in May 1985. Seven months after the '330 Patent was granted, Singer U.S. assigned the '330 Patent to Singer Germany. Both prior to and after the assignment, Singer Germany provided Singer Brasil support for the installation, utilization and repair of the Specialized Equipment. Since 1983, Singer Brasil has openly manufactured the needles using the technology claimed in the '330 Patent. The Plaintiffs assert that, in light of the foregoing facts, Singer Brasil has an implied license to the '330 Patent which con-

---

(No. 17), *available at http://www.nysb.uscourts.gov ("Groz I").* That motion is currently on appeal. Subsequently issue was joined.

**2.** At the time the Patent Application was filed, Singer Germany was engaged in the manufacture of needles such as described in the Patent Application.

**3.** Singer Germany sold Singer Brasil the MABU 12T–Press equipped with a special mold designed to manufacture the needles using the '330 Patent technology.

stitutes estate property under section 541(a) of the Bankruptcy Code.

Since 1994, Dyno has exclusively distributed Singer Brasil's needles in the United States. Sales of the allegedly infringing needles represent almost 8.5% of Singer Brasil's aggregate sales.

**The Florida Action**

On September 21, 1999, the local officers of Singer Germany unilaterally commenced a reorganization proceeding in Germany (the "German Insolvency"). The German Insolvency is independent and uncoordinated with the insolvency proceedings of the Plaintiffs. In connection with the German Insolvency, Dr. Jorg Zunbaum, AM Courtenbaschof 3 Duren, Germany, was appointed as the insolvency administrator (the "German Trustee") of the assets of Singer Germany. In November 1999, Groz purchased certain assets of Singer Germany in the course of the German case. Among those assets was the '330 Patent. On August 10, 2000, nearly nine months after purchasing the '330 Patent and two weeks before the scheduled hearing on confirmation of Singer's Plan, Groz commenced the Florida Action, alleging that Dyno's sale of needles manufactured abroad by Singer Brasil infringes the '330 Patent and seeking injunctive relief and damages to remedy the alleged infringement and stop the distribution of the needles. On September 11, 2000, the Plaintiffs commenced the instant adversary proceeding against Groz and Dyno and filed a motion seeking to enjoin the Florida Action. On October 13, 2000, Groz filed a motion to dismiss the instant adversary proceeding. As stated above, on November 3, 2000, this Court granted the Plaintiffs' motion to stay the Florida Action and denied Groz's motion to dismiss this adversary proceeding. On December 5, 2000, Groz answered the Complaint, asserting a counterclaim against Singer Brasil (the "Counterclaim") and a cross-claim against Dyno (the "Cross Claim") for patent infringement based on the same matters alleged in the Florida Action (the "Answer"). Three days later, almost three months after the Complaint was filed, Groz moved to withdraw the reference.

## II. DISCUSSION

A court may grant summary judgment under Federal Rule of Civil Procedure 56 in a patent case, as in other cases, only if it is satisfied that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Mitchell v. Washingtonville Central School District,* 190 F.3d 1, 5 (2d Cir.1999); *Philip v. L.F. Rothschild & Co.,* 2000 U.S. Dist.LEXIS 12770 at *11. *See also Continuous Curve Contact Lenses, Inc. v. Rynco Scientific Corp.,* 680 F.2d 605, 607 (9th Cir.1982) (summary judgment is proper in a patent action if the patent claims can be understood, without expert aid, by anyone of modest intelligence), *citing Vermont Structural Slate Co. v. Tatko Bros. Slate Co.,* 233 F.2d 9 (2d Cir.), *cert. denied,* 352 U.S. 917, 77 S.Ct. 216, 1 L.Ed.2d 123 (1956). *But see Morpul, Inc. v. Glen Raven Knitting Mill, Inc.,* 357 F.2d 732, 736 (4th Cir.1966) (summary judgment should be employed with great caution in patent cases). If the decision on laches or equitable estoppel is made on summary judgment, there must, in addition, be no genuine issues of material fact, the burden of proof of an issue must be correctly allocated, and all pertinent factors must be considered. *A.C. Aukerman Co.v. R.L. Chaides Construction Company,* 960 F.2d 1020, 1039 (Fed.Cir.1992).

The initial burden rests on the moving party to demonstrate the absence of a

genuine issue of material fact, and all inferences and ambiguities must be resolved in favor of the party against whom summary judgment is sought. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). If this burden is met, the burden then shifts to the non-moving party to come forward with evidence to defeat the motion for summary judgment. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The non-moving party must set forth "specific facts showing that there is a genuine issue for trial" and the evidence cannot consist of "mere allegations or denials of the adverse party's pleading." Fed.R.Civ.P. 56(e); *see also Delaware & Hudson Ry. v. Consolidated Rail Corp.,* 902 F.2d 174, 178 (2d Cir.1990) ("Conclusory allegations will not suffice to create a genuine issue."), *cert. denied,* 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991). Moreover, although the evidence is considered in the light most favorable to the non-moving party, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505, and "the mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985).

## CORPORATE SEPARATENESS

Initially I note that Groz contends, in what seems to be an attempt to create a material issue of fact, that the Plaintiffs cannot rely on an implied license defense because Singer Brasil and Singer Germany "were wholly owned subsidiaries whose activities were coordinated and controlled by a common parent." *Groz Memorandum* at p. 9. Although Groz vehemently denies

it in its *Memorandum in Further Opposition,* Groz's assertions are essentially identical to an alter ego/ corporate veil piercing argument.

The Second Circuit has held that federal common law allows piercing of the corporate veil where a corporation uses its alter ego to perpetrate a fraud or where it so dominates and disregards its alter ego's corporate form that the alter ego was actually carrying on the controlling corporation's business instead of its own. *See Kirno Hill Corp. v. Holt,* 618 F.2d 982, 985 (2d Cir.1980). Groz argues that it has established without contradiction that "Singer was the owner and controlled the operations of both Singer Germany and Singer Brasil from a time prior to 1983 until bankruptcy proceedings for Singer, Singer Brasil and Singer Germany began in 1999.... Singer Germany and Singer Brasil engaged in all the activities relevant to this case under Singer's express management and direction." *Groz Memorandum in Further Opposition* at p. 12. In essence, it appears that Groz is arguing that since it bought the '330 Patent from Singer Germany, the Singer family should be estopped from arguing that they sold a "pig in a poke." Upon a thorough review of the record in these bankruptcy cases and this adversary proceeding, I find that the Groz's assertions do not rise to the level necessary to pierce the corporate veil.

First, aside from the common ownership of these two corporations by Singer, Groz has not shown a shared corporate existence or common scheme to perpetrate fraud on third parties. Common ownership alone is insufficient to support disregard of the corporate form. *See United States v. Jon–T Chemicals, Inc.,* 768 F.2d 686, 691 (5th Cir.1985), *cert. denied,* 475 U.S. 1014, 106 S.Ct. 1194, 89 L.Ed.2d 309 (1986). Moreover, Groz alleg-

es no credible ground to disregard Singer Brasil's separateness. Even related companies are afforded the presumption of separateness. *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir.1996); *Williams v. McAllister Bros.*, 534 F.2d 19, 22 (2d Cir.1976).

Secondly, despite Groz's assertions that it purchased the '330 Patent from Singer Germany, Groz purchased the patent along with other assets from the German Trustee, Dr. Jorg Zunbaum, in the unrelated German Insolvency proceeding. Under German law, "the right of the debtor to administer and dispose of property within the bankruptcy estate passes to the trustee." *See Declaration of Angela Ingebourg Daniel in Support of Plaintiffs Motion for Summary Judgment* at ¶ 7. Thus, any attempt to portray the Singer family as the seller of the '330 Patent completely misstates the facts.

■ Thirdly, Groz has no standing to seek to disregard the corporate separateness of the Plaintiffs. Causes of action for piercing the corporate veil or for alter ego liability pass to the bankruptcy trustee or the debtor in possession and constitute property of the estate. *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 133 (2d Cir.1993); *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 704–05 (2d Cir.1989); *Keene Corp. v. Coleman (In re Keene Corp.)*, 164 B.R. 844, 852 (Bankr. S.D.N.Y.1994).

■ Finally, Groz, in purchasing the patent, steps into the shoes of the seller. *See* 5 Ernest Bainbridge Lipscombe III, *Walker on Patents* § 19.21 (3d ed.1986). Groz was fully aware of the Singer Brasil patent use at all pertinent times. *See Turnbull Affidavit*, Exhibit D ("As far as we know, these patents are also used by Singer to produce household needles in Brazil. In view of the circumstances, we would like to express our serious interest in Singer Brasil.") However, Groz failed to file any claim against the Debtors. Accordingly, any claim Groz may have had was discharged pursuant to the terms of the Plan. *See* 11 U.S.C. § 1141(d)(1)(A).

Accordingly, even accepting all of Groz's factual assertions as true, Groz's submissions fail to raise any material issue of fact as to the corporate separateness of the Plaintiffs.

## IMPLIED LICENSE

■ The Plaintiffs assert that Singer Brasil has an interest in the '330 Patent in the form of an implied license. The existence, nature and extent of the debtor's interest in a particular item of property are determined by applicable non-bankruptcy law. *See Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *Official Committee of Unsecured Creditors v. PSS S.S. Co. (In re Prudential Lines, Inc.)*, 928 F.2d 565, 569 (2d Cir.1991); *Sanyo Electric, Inc. v. Howard's Appliance Corporation (In re Howard's Appliance Corporation )*, 874 F.2d 88, 93 (2d Cir.1989); *Pereira v. Summit Bank*, 2001 WL 180022 (S.D.N.Y. February 21, 2001).

■ As a threshold matter, an implied license merely signifies a patentee's waiver of the statutory right to exclude others from making, using, or selling the patented invention. *Spindelfabrik Suessen–Schurr Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 829 F.2d 1075, 1081 (Fed. Cir.1987), *cert. denied*, 484 U.S. 1063, 108 S.Ct. 1022, 98 L.Ed.2d 987 (1988); *United States v. Studiengesellschaft Kohle, m.b. H.*, 670 F.2d 1122, 1127 (D.C.Cir.1981) ("[A] patent license agreement is in essence nothing more than a promise by the licensor not to sue the licensee.") The argument of implied license is a defense to a patent infringement allegation. *See*

*Met–Coil Sys. Corp. v. Korners Unlimited, Inc.*, 803 F.2d 684, 687 (Fed.Cir.1986).

■ The existence of an implied license is a question of law. *Glass Equipment Development, Inc. v. Besten, Inc.*, 174 F.3d 1337, 1341 (Fed.Cir.1999); *Met–Coil Systems*, 803 F.2d at 687. An implied license can be created pursuant to several different legal theories, including acquiescence, by conduct, by equitable estoppel, or by legal estoppel. *Wang Laboratories, Inc. v. Mitsubishi Electronics*, 103 F.3d 1571, 1580 (Fed.Cir.1997), *cert. denied*, 522 U.S. 818, 118 S.Ct. 69, 139 L.Ed.2d 30 (1997), *citing AMP, Inc. v. United States*, 182 Ct.Cl. 86, 389 F.2d 448 (1968), *cert. denied*, 391 U.S. 964, 88 S.Ct. 2033, 20 L.Ed.2d 878 (1968).

■ In *De Forest Radio Telephone & Telegraph Co. v. United States*, 273 U.S. 236, 47 S.Ct. 366, 71 L.Ed. 625 (1927), the Supreme Court first enunciated the principles of implied licensing:

> No formal granting of a license is necessary in order to give it effect. Any language used by the owner of the patent, or any conduct on his part exhibited to another from which that other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license and a defense to an action for a tort. Whether this constitutes a gratuitous license, or one for a reasonable compensation, must of course depend upon the circumstances; but the relation between the parties thereafter, in respect of any suit brought, must be held to be contractual and not [in tort].

*De Forest Radio Telephone Co. v. United States*, 273 U.S. at 241, 47 S.Ct. 366. The burden of proving that an implied license exists is on the party asserting an implied license as a defense to infringement. *See*

*Met–Coil Systems*, 803 F.2d at 687. The Plaintiffs have met that burden.

## I) SINGER U.S. GRANTED SINGER BRASIL AN IMPLIED LICENSE

Groz argues that when Singer Germany sold Singer Brasil the Specialized Equipment and provided training for the manufacturing of the needles utilizing the '330 Patent, it was Singer U.S., not Singer Germany, who owned the patent and, therefore, Singer Germany could not have given Singer Brasil an implied license since it had no rights to give up. The Plaintiffs assert that the argument that the '330 Patent was owned by Singer U.S. at the beginning and not by Singer Germany is a red herring. I agree.

■ Singer Brasil claims that its implied license arose at the beginning of its use of the '330 Patent technology. *See Summary Judgment Motion Transcript* at p. 46. It is well established that the federal law regarding the assignment of patents makes patent assignments subject to the conditions of any licenses, including implied licenses, *see Sanofi, S.A. v. Med–Tech Veterinarian Products, Inc.*, 565 F.Supp. 931, 939–40 (D.N.J.1983), or other rights previously conferred by the patent holders. *Waterman v. Mackenzie*, 138 U.S. 252, 258, 11 S.Ct. 334, 34 L.Ed. 923 (1891); *American Dirigold Corp. v. Dirigold Metals Corp.*, 125 F.2d 446, 452 (6th Cir.1942); *L.L. Brown Paper Co. v. Hydroiloid, Inc.*, 118 F.2d 674, 677 (2d. Cir.), *cert. denied*, 314 U.S. 653, 62 S.Ct. 101, 86 L.Ed. 523 (1941); *Keystone Type Foundry v. Fastpress Co.*, 272 F. 242, 245 (2d Cir. 1921) (An assignee of a patent takes title subject to prior valid licenses, whether or not he had knowledge of them.) Therefore, Singer Germany, like any other assignee, assumed all the rights and costs of Singer U.S., the parent, when it was assigned the '330 Patent. Among the rights and costs assumed by Singer Germany was

Singer Brasil's implied license. Moreover, when Groz purchased all of the assets of Singer Germany, including the '330 Patent, from the German bankruptcy trustee, *with the knowledge that the '330 Patent was being exploited by Singer Brasil. See Turnbull Affidavit,* Exhibit D. Accordingly, for the reasons set forth above, Groz purchased the '330 Patent subject to Singer Brasil's open and notorious implied license.

## II) SINGER GERMANY GRANTED SINGER BRASIL AN IMPLIED LICENSE

Even if Singer U.S. had not granted Singer Brasil an implied license, the record amply demonstrates that, from the time of the assignment in 1986, Singer Germany granted Singer Brasil an implied license, by equitable estoppel and through the sale of equipment, to use the '330 Patent.

### A. Equitable Estoppel / Conduct of the Parties

 Generally, a determination as to whether a license will be implied depends on whether the patent owner under the circumstances is estopped from asserting infringement. The doctrines of legal estoppel and equitable estoppel have been applied by courts to imply a license. *See, e.g., AMP, Inc. v. United States,* 389 F.2d at 452. Legal estoppel and equitable estoppel are "labels that describe not different kinds of licenses, but rather different categories of conduct which lead to the same conclusion: an implied license. The label denotes the rationale for reaching the legal result." *Wang Laboratories, Inc. v. Mitsubishi Electronics,* 103 F.3d at 1580.

"Whether estoppel applies is a question of law." *Id.* at 1578.

"[T]he relatively few instances where implied licenses have been found rely on the doctrine of equitable estoppel. . . . One common thread in cases in which equitable estoppel applies is that the actor committed himself to act, and indeed acted, as a direct consequence of another's conduct. Thus, an implied license cannot arise out of the unilateral expectations or even reasonable hopes of one party. One must have been led to take action by the conduct of the other party." *Stickle v. Heublein, Inc.,* 716 F.2d 1550, 1559 (Fed.Cir.1983) (citations omitted). *See also Medeco Security Locks, Inc. v. Lock Technology Corp.,* 199 U.S.P.Q. 519, 524 (S.D.N.Y.1976) (An implied license arises out of the objective conduct of the parties, which a reasonable person would regard as indicating that an agreement has been reached.)

"The primary difference between the estoppel analysis in implied license cases and the analysis in equitable estoppel cases is that implied license looks for an affirmative grant of consent or permission to make, use, or sell: i.e., a license. Equitable estoppel, on the other hand, focuses on 'misleading' conduct[4] suggesting that the patentee will not enforce patent rights." *Wang v. Mitsubishi,* 103 F.3d at 1581 (internal citations omitted). In *Wang v. Mitsubishi,* instead of focusing on misleading conduct, the Federal Circuit held that the test for determining whether an implied license arises based on equitable estoppel involves an inquiry into whether there was "consent or permission to make, use, or

---

4. In *Aukerman,* the Federal Circuit described a typical equitable estoppel situation as one in which (1) the infringer knows of the patent, (2) the patentee objects to the infringer's activities, (3) but the patentee does not seek relief until much later, (4) thereby misleading the infringer to believe the patentee will not act. *Aukerman* at 1042–43.

sell" the patented products[5]. *Wang v. Mitsubishi*, 103 F.3d at 1581; *see also Travelers Express Co. v. American Express Integrated*, 80 F.Supp.2d 1033, 1038 (D.Minn.1999) (License by estoppel is created if the purported licensee can show that 1) there is infringement; 2) the patent owner had knowledge of the infringement; 3) the patent owner engaged in conduct that induced the purported licensee to believe that the patent owner acquiesced in the infringement; and 4) the purported licensee relied on the patent owner's conduct.)

The Federal Circuit also held in *Wang* that in a business relationship, conduct such as close cooperation on an innovative project can give rise to an implied license. In *Wang*, the patentee, Wang, invented the basic memory module, known as a SIMM (single in-line memory module). Wang was not a components manufacturer and did not want to develop and manufacture SIMMs. As a result, Wang tried to coax Mitsubishi into the computer memory chip market by providing designs, suggestions, and samples to Mitsubishi. Mitsubishi complied and Wang started purchasing SIMMS. In the meantime, Wang obtained its patent and accused Mitsubishi of infringement. Given this behavior pattern of strong inducement by Wang leading directly to Mitsubishi's entry into the field, the court concluded that Mitsubishi had an implied license under Wang's patents. *Wang*, 103 F.3d at 1581–82.

Under this general standard, the implication of a license depends upon all of the circumstances, including the parties' conduct, the terms of applicable written agreements and correspondence, the reasonable expectation of the parties, the dictates of fairness and equity, and the policies underlying the intellectual property system. *See generally Wang*, 103 F.3d at 1580 (implied licenses arise by ... conduct), *citing AMP, Inc. v. United States*, 389 F.2d at 452 nn. 4–5; *Hewlett–Packard Co. v. Pitney Bowes Corp.*, 46 U.S.P.Q.2d 1595 (D.Or.1998) (Implied license defense prevails against defendant who supplied parts and technical know-how to manufacturer and seller of ink jet printers for addressing envelopes without ever raising patent infringement issue.)

Here, it is undisputed that Singer Germany had knowledge of Singer Brasil's manufacture of the patented needles. Moreover, through the sale of the Specialized Equipment and the technical support provided by Singer Germany, the Plaintiffs have proved that the "entire course of conduct" between the parties over the almost fifteen year period led Singer Brasil to infer consent to manufacture and sell the patented needles. *See e.g., Wang v. Mitsubishi*, 103 F.3d at 1581–82, *citing De Forest*, 273 U.S. at 241, 47 S.Ct. 366. Furthermore, Singer Brasil, who had an ongoing relationship with Singer Germany and acted in reliance on Singer Germany's actions and behavior (including its affirmative support), as well as its silence, invest-

---

5. In a somewhat conclusory fashion, Groz asserts that "the *Wang* case ... says there has to be consideration." *See Summary Judgment Motion Transcript* at p. 39. Groz, however, failed to qualify that the *Wang* Court was referring to legal estoppel:

> The jury's findings may support an implied license in the nature of legal estoppel given the transfer of a right for consideration and the subsequent suit for infringement.

*Wang*, 103 F.3d at 1583. *See also Genencor Intern., Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 13 n. 10 (Del.2000) ([L]egal estoppel, rather than equitable estoppel, applies where a patentee has licensed or assigned a right, received consideration, and then sought to derogate from the right granted.)

ed significant resources in developing a business based on the manufacture of the patented needles. *Hammer Declaration* at ¶¶ 7–8; *Coch Affidavit* at ¶ 12. Accordingly, as was the case in *Wang*, I find that Singer Brasil's implied license is in the nature of equitable estoppel, because the license arose from an accord implicit in the entire course of conduct between the parties as discussed in *De Forest* and subsequent cases relying on equitable estoppel as a guideline.

## B. Sale of Equipment

 The Federal Circuit has also held that the sale [6] of unpatented equipment which is used to conduct a patented process may itself constitute the grant of an implied license to conduct the process. *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, 72 F.3d 872, 878 (Fed. Cir.1995); *Met–Coil Systems*, 803 F.2d at 686. Here, there is no dispute that Singer Germany sold Singer Brasil the Specialized Equipment. When, as here, a party argues that the sale of a device carries with it an implied license to use that device in practicing a patented invention, that party, namely Singer Brasil, has the burden to show that, *inter alia*, the purchased device has no non-infringing uses. *See Glass Equipment Development, Inc.*, 174 F.3d at 1342; *Carborundum*, 72 F.3d at 878 (generally, the sale of a device by a patent owner or its licensee carries with it an implied license to use that device in practicing the patented invention when the purchased device has no non-infringing uses.)

Here, Groz argues that an implied license did not arise from Singer Germany's sale to Singer Brasil because the equipment, if altered, has non-infringing uses. To support this contention, Groz asserts that the equipment is generally "capable of a range of functions" and that the fact that the equipment could be used to manufacture the needles for sale in markets outside the United States constitutes a non-infringing use. I find these arguments unpersuasive.

First of all, it is undisputed that the Specialized Equipment sold to Singer Brasil was the MABU–12T press machine *fitted with the mold to manufacture the patented needle*. *Hammer Declaration* at ¶ 6; *Coch Affidavit* Exhibit I. Groz now wants this Court to effectively dismantle the equipment sold to Singer Brasil by focusing on the MABU–12T press *independent of the mold* in order to support its contention that the Specialized Equipment has non-infringing uses. In support of its assertion that the MABU–12T Press has other non-infringing uses, Groz submitted an untranslated German brochure that purportedly describes (no translated English version was submitted to the Court) a myriad of alleged MABU–12T Press uses, "such as punching, cutting out, or perforating holes in ... sheet metal." *See Buchle Declaration* at ¶ 7. Even if the MABU–12T Press can be used as such, Groz fails to acknowledge that the equipment sold to Singer Brasil was not simply a MABU–12T Press—it was a MABU–12T Press *with a specialized mold* that can only be used to manufacture the '330 Patent needles.

Secondly, Groz argues that the manufacture of needles for sale outside the United States is, in itself, a qualifying noninfringing use. The Plaintiffs contend that Groz's

---

**6.** In *Sanofi, S.A. v. Med–Tech Veterinarian Products, Inc.*, 222 U.S.P.Q. 143, 148–149 (D.Kan.1983), the Court held that the acquisition of a patented embodiment from a subsidiary of the patent owner is not in itself sufficient to establish the grant of an implied license from the patent owner/ parent corporation.

argument that the ability to sell the needles outside of the patented territory, in this case the U.S., is a non-infringing use is ludicrous since no patent covers every territory in the world and generally no patent holder seeks and obtains patents in every single country. Relying on *Glass Equipment Development,* Groz argues that a non-infringing use qualifies only if it is "reasonable." *Glass Equipment Development,* 174 F.3d at 1342. Groz's reliance on *Glass Equipment Development* for the proposition that the manufacture of needles outside the United States qualifies as a noninfringing use is misplaced.

In *Glass Equipment Development,* the Federal Circuit held that in order for an implied license to arise from the sale of a device, it was not enough to show that the device had no current noninfringing use or that any potential noninfringing use of the device was not "commercially viable." The case involved a suit by Glass Equipment Development ("Glass") for patent infringement against Besten, Inc. ("Besten"), a competitor in the sale of extruding machines used in the manufacture of thermally insulating glass windows. Glass owned a patent on a method of making "spacer frames" that involved the use of "corner keys" that joined the spacer frames at their ends. The joined spacer frames were then sandwiched between two sheets of glass to form an insulating space between the glass sheets. Besten sold an extruding machine to a window manufacturer Simonton Windows Company ("Simonton") who used the machine to make spacer frames in accordance with the patented method. However, because Simonton had used corner keys purchased from Glass' licensee in making the spacer frames, Besten argued that an implied license to practice the patented method existed and there was no infringement.

The Federal Circuit held that it was not enough for Besten to show that previously used noninfringing methods were no longer being used. The Court reasoned that Besten needed to show that these previous uses had become unreasonable for all insulated window manufacturers.

The Federal Circuit also held that it was not enough for Besten to show that other noninfringing uses were not as profitable as the patented method in order for an implied license to arise. The Court reasoned that a legally acceptable noninfringing use need not be as profitable as the patented method, it need only be as reasonable. Accordingly, the Federal Circuit held as a matter of law that no implied license existed.

If this Court were to accept Groz's overly broad interpretation of what qualifies as a "reasonable" noninfringing use, the whole concept of implied licenses based on the sale of equipment would effectively be turned on its ear. In *Glass Equipment Development,* the previously non-infringing methods listed *did not include* making the spacer frames pursuant to the patented method outside of the U.S. Rather, the "reasonable" noninfringing use referred to by the Federal Circuit in *Glass Equipment Development* was the "cartwheel method" of manufacturing spacer frames as opposed to the patented linear method. Consequently, the Plaintiffs have amply demonstrated that no issue of material fact exists with regard to the fact that the Specialized Equipment, as sold by Singer Germany, has no noninfringing uses.

**The Replacement of the Mold**

Relying on the Federal Circuit's decision in *Carborundum,* Groz further argues that any implied license that may have arisen from the sale of the Specialized Equipment was terminated when Singer Brasil

changed the mold [7]. In *Carborundum*, the Federal Circuit held that a purchaser of an unpatented component of a patented combination from the patent holder obtains an implied license to use the patented combination for the life of that component. *Carborundum*, 72 F.3d at 880. However, that case is distinguishable from the case at hand. In *Carborundum*, Carborundum owned a patent on an apparatus for melting scrap metal, one component of which was a pump specifically designed for conveying molten metal. Carborundum sold only the pump, not the entire apparatus. When the defendant Molten Metal also began selling replacement pumps to Carborundum customers, Carborundum sued. The Federal Circuit held that Carborundum, by selling pumps that customers combined with other equipment for the patented system, granted an implied license to practice invention only for the life of pumps. The only question concerned the scope of this implied license. Carborundum argued that the implied license extended only for the life of the purchased pump, while Molten Metal argued that the implied license extended without restriction, for the entire term of the patent. The court turned to a flexible all-circumstances approach to determine the scope of the implied license. Based upon circumstances of the sale as to what the parties reasonably intended as to the scope of the implied license, the Federal Circuit concluded that the implied license extended only for the life of the pump.

The Plaintiffs argue that *Carborundum* is not applicable in this case because of one principal difference—namely "the difference between using a patented invention and being given permission, i.e. a license to actually practice the patent." *See Summary Judgment Motion Transcript* at p. 20. I agree. Singer Germany sold Singer Brasil a machine that would enable it to practice the '330 Patent. The implied license, in this case, was to manufacture needles falling within the claims of the '330 Patent. Moreover, unlike in *Carborundum*, the mold sold by Singer Germany to Singer Brasil was not a component part of a patented invention; it was an integral component part of the Specialized Equipment *used to manufacture* the patented needle. Accordingly, the replacement or modification of the mold [8] is irrelevant if the needles made with the "new" mold continue to infringe the '330 Patent.

Clearly there is no question in the record before this Court that the Specialized Equipment sold to Singer Brasil by Singer Germany, specifically the MABU–12T press fitted with the *specialized* mold, had no other non-infringing use except for making the needles. Accordingly, for the reasons set forth above, the sale of the Specialized Equipment by Singer Germany to Singer Brasil carried with it an implied license to use that device in practicing the '330 Patent.

## III. LACHES

The Plaintiffs argue that Singer Germany is barred by laches because it inexcus-

---

7. As of March, 2000, Singer Brasil changed the Specialized Equipment's mold used to manufacture needles and commenced production of needles using the new mold. There is a dispute among the parties as to whether the new mold is within the '330 Patent and the implied license. *See Complaint* at ¶ 13.

8. Furthermore, Groz's own submissions evidence that it was contemplated by the parties, based upon the circumstances of the sale of the Specialized Equipment, that the molds, which wear out after approximately 50,000 hits, would have to be repaired in order to service the machines. *See Hammer Declaration* at ¶ 2; *Coch Affidavit* at ¶¶ 7–8 & Exhibits E–H.

ably failed to assert its rights under the '330 Patent. In turn, Groz argues, without citing to any case law, that it would be ludicrous to find laches "against a party who failed to sue an affiliate." *Groz Memorandum in Opposition* at p. 14. Groz further contends, again unsupported by any case law, that laches should only apply when "both assignee and its predecessor were clearly on notice of the neglected cause of action."

The rule governing laches in patent cases was reviewed by the Federal Circuit in *Aukerman.* Laches is "the neglect or delay in bringing suit … which … causes prejudice to the adverse party." *Id.* 960 F.2d at 1028–29. According to *Aukerman,* a laches defense is available to a defendant accused of infringing a patent when the patentee has inexcusably delayed for an unreasonable amount of time in filing an infringement suit and, as a result, has caused material prejudice to the alleged infringer. Unreasonable delay, for the purpose of laches, is measured from the time the patent holder knew or reasonably should have known of its claim against the defendant. *See Aukerman,* 960 F.2d at 1032 (court found that a presumption of laches arose when more than six years had passed from the time the plaintiff knew or should have known of the infringement and the time the plaintiff filed suit.); *Royal–McBee Corp. v. Smith–Corona Marchant, Inc.,* 295 F.2d 1, 4–5 (2d Cir.1961) (plaintiff for seven years failed to apprise defendant of its intention to pursue patent infringement action, and defendant had built up business considerably in the interim: therefore defendant was allowed to continue use of infringing device upon payment of fair royalty during relatively short period remaining before expiration of patent). *See also Minnesota Mining & Manufacturing Co. v. Berwick Industries, Inc.,* 373 F.Supp. 851, 870 (M.D.Pa.1974), *aff'd* 532 F.2d 330 (3d Cir. 1976) (plaintiff's ten-year delay in notifying defendant of existence of patents constituted laches, and defendant's allegedly infringing business had grown enormously in interim; plaintiff was denied injunctive relief, and defendant was granted right to continue infringing activities on payment of reasonable royalty, where patent then had only relatively short remaining life.). *But see Accuscan v. Xerox Corp.,* 1998 WL 273074 (S.D.N.Y. May 26, 1998) (Plaintiff delayed filing an infringement suit in order to avoid the burden of conducting two simultaneous infringement suits and to attempt to negotiate a license agreement with the defendant; the court found these reasons sufficient to rebut the presumption of laches.)

"Laches remains an equitable judgment of the trial court in light of all the circumstances." *Aukerman,* 960 F.2d at 1036. Laches, however, only bars relief on a patentee's claim with respect to damages accrued prior to the filing of a suit for patent infringement. *Odetics, Inc. v. Storage Tech. Corp.,* 185 F.3d 1259, 1272–73, *citing Aukerman,* 960 F.2d at 1041. *See also Lane & Bodley Co. v. Locke,* 150 U.S. 193, 14 S.Ct. 78, 37 L.Ed. 1049 (1893) (recognizing defense of laches in the context of patent infringement).

Here, the record clearly demonstrates that Singer Brasil has been utilizing the '330 Patent since the time the '330 Patent was issued more than fifteen years ago. Moreover, not only do Groz's own submissions demonstrate that Singer Germany was aware of every aspect of Singer Brasil's allegedly infringing activities, *see Hammer Declaration* at ¶¶ 5–8; *Coch Affidavit,* Exhibit K, but that Groz was fully aware, *prior* to purchasing the '330 Patent, that Singer Brasil was manufacturing the patented needles and selling them in the United States. *See Buchle Affidavit* at

¶¶ 4–5. Furthermore, the abandonment of Singer Brasil's existing Specialized Equipment and material used in the manufacturing of the needles, built up over years of delay in Singer Germany's enforcement of its patent rights, would not only cause economic waste [9], but could impede Singer Brasil's ability to generate the revenue expected at the time the chapter 11 case was confirmed as well as Singer Brasil's ability to make the payments required under the terms of the notes issued to creditors under the Plan. *See Turnbull Declaration* at ¶ 29. Moreover, this waste and impairment to Singer Brasil's Plan is particularly senseless since the patent expires in two years [10]! The doctrine of laches is clearly appropriate where a patentee seeks to prevent a company, who has been openly and notoriously using a patent for eighteen years, from commercially exploiting the patent. Accordingly, for the reasons set forth above, I find that the defense of laches is available to Singer Brasil.

## IV. Discovery

▇▇▇▇ In the alternative, Groz argues that it is entitled to discovery, under Federal 56(f), made applicable in this adversary proceeding by Bankruptcy Rule 7056(f) [11], before the Summary Judgment Motion should be allowed to proceed. The rule, which is to be applied with a "spirit of liberality", *Allstate Ins. Co. v. Administratia Asigurarilor De Stat,* 948 F.Supp. 285, 293–94 (S.D.N.Y.1996), is designed to "ensure that parties have a reasonable opportunity to make their record before the court rules on a motion for summary judgment." *Id., citing Sundsvallsbanken v. Fondmetal, Inc.,* 624 F.Supp. 811, 814–15 (S.D.N.Y.1985); *see also Trebor Sportswear Co. v. The Limited Stores, Inc.,* 865 F.2d 506, 511 (2d. Cir.1989) (summary judgment premature where nonmoving party did not have a "fully adequate opportunity for discovery"). This rule is usually used in situations "in which the facts are exclusively or largely within the knowledge or control of the moving party or nonparties, thereby rendering it impossible for the nonmoving party to submit timely affidavits or other evidentiary materials demonstrating the existence of genuine issues of fact." 10 L.P. King, Collier on Bankruptcy, ¶ 7056.08, at 7056–11 (15th ed.1997).

▇▇▇▇ It is well-established that, pursuant to Federal Rule 56(f), a "party resisting summary judgment on the ground that it needs discovery in order to defeat the motion must submit an affidavit showing (1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expect-

**9.** Singer Brasil contends that, in order to retool its household needles manufacturing line, Singer Brasil will have to shut-down manufacturing for a period of about six to nine months. In addition, Singer Brasil will have to shut down the household sewing machine manufacturing line for a significant period of time as well. *See Turnbull Declaration* at ¶ 27.

**10.** At the hearing on the Summary Judgment Motion, counsel for Groz informed the Court that the '330 Patent expires in 2003.

**11.** Fed.R.Bankr.P. 7056(f) provides, in pertinent part:

(f) When Affidavits are Unavailable. Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Bankr.P. 7056(f). *See also,* 10 L.P. King, Collier on Bankruptcy, ¶ 7056.08, at 7056–11 to 7056–12 (15th ed.1997).

ed to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Gurary v. Winehouse,* 190 F.3d 37, 43 (2d Cir.1999) (internal quotation marks omitted). Groz filed such an affidavit, listing a whirlwind of issues on which it seeks discovery, including:

1) the facts and circumstances of the sale by Singer Germany to Singer Brasil of the Specialized Equipment allegedly giving rise to Singer Brasil's implied license;

2) the alleged training, maintenance and support provided by Singer Germany to Singer Brasil, allegedly supporting the implied license;

3) the extent to which Singer Brasil has or could have used the Specialized Equipment for non-infringing uses;

4) the facts and circumstances surrounding the change of the mold used by Singer Brasil to make infringing needles;

5) the facts and circumstances allegedly giving rise to estoppel and laches, including Singer Brasil's alleged reliance on statements or actions of Singer Germany and the alleged harm suffered by Singer Brasil if it is not permitted to continue to produce needles under the '330 Patent; and

6) the facts and circumstances of Singer's recording of assignments of the '330 Patent and its continued belief that it owned the Patent as late as April 2000.

*See Coch Affidavit* at ¶ 29. Regardless of the fact that Groz submitted its discovery requests almost five months *after* the adversary proceeding was commenced, Groz has failed to establish any reasons why it is impossible for it to submit evidentiary materials demonstrating the existence of genuine issues of fact. With respect to most of the issues on which Groz seeks discovery, the facts are already in Groz's possession as evidenced by its purchase of Singer Germany's assets and its procurement of the Hammer Declaration[12].

Specifically, Groz's contention that it needs discovery regarding the facts and circumstances of the sale of the Specialized Equipment is somewhat suspect because the essential facts are already within the knowledge and control of, or at least *available* to, Groz since they own Singer Germany! The same goes for Groz's "alleged training" discovery requests. Not only do the declarations of both Mr. Hammer and Mr. Büchle both comment extensively on it, but more importantly, this request is immaterial since Groz admits that Singer Germany knew that Singer Brasil was manufacturing the '330 Patent needles. *See Hammer Declaration* at ¶¶ 5–8. Finally, the discovery request addressing the non-infringing use of the equipment is also somewhat disingenuous since Groz admits that the "MABU 12T Press shipped to Singer Brasil in 1986 included a working mold and handling system that were required to produce the New Household Needles." *Hammer Declaration* ¶ 6. Moreover, none of the other issues on which Groz seeks discovery present any material disputed issues of fact. Accordingly, for the reasons set forth above, Groz's request pursuant to Federal Rule 56(f) is denied.

---

12. Hans Hammer is one of the four named inventors of the '330 Patent. He was employed by Singer Germany from January 12, 1959 to October 31, 1999. From 1968 to 1999, he was the Production Manager for Singer Germany and was in charge of production of all needles, including the needles made using the '330 Patent technology. During the time he was Production Manager, his responsibilities included overseeing needle production for, *inter alia,* Singer Brasil. *See Hammer Declaration* at ¶¶ 1–2.

## V. COUNTS THREE THROUGH SIX

The Plaintiffs also move for summary judgment on Counts Three through Six of the Complaint seeking: a final declaration that the Florida Action violated the automatic stay; a contempt citation against Groz for its "willful" violation of the automatic stay; a permanent injunction barring prosecution of the Florida Action; and, alternatively, a permanent injunction staying the Florida Action under section 105(a) of the Bankruptcy Code. Pursuant to the invitation to rule on the summary judgment motion and cross motion, I have determined that Singer Brasil has an implied license to the '330 Patent. Since the implied license is the indirect subject of the Florida Action, it would appear that the balance of the issues are ripe for determination. However, in light of the fact that there is an appeal still pending before the District Court (brought before issue was joined), I will refrain from making a determination on the issues that may be implicated in the appeal. Accordingly, Singer Brasil's motion for summary judgment on Counts Three through Six of the Complaint is denied without prejudice.

Submit an order consistent with the foregoing findings.