In re NU–CORP INTERNATIONAL TECHNOLOGIES, INC., Debtor.

Judy C. Jones, et al., Plaintiffs,

v.

Boyd B. Greene, et al., Defendants.

Bankruptcy No. 05–19490. Adversary No. 05–1249.

United States Bankruptcy Court, N.D. Mississippi.

Feb. 12, 2007.

Toni Campbell Parker, Attorney at Law, Memphis, TN, for Plaintiffs.

Nina Stubblefield Tollison, Oxford, MS, Chapter 11 Trustee.

Denvil F. Crowe, Crowe and Associates, Tupelo, MS, for Defendants.

### OPINION

DAVID W. HOUSTON, III, Bankruptcy Judge.

On consideration before the court are the following pleadings:

(1) Motion to determine the rights of parties filed by Nina S. Tollison, Chapter 11 Trustee (Trustee); a response to said motion having been filed by Boyd B. Greene, Janis M. Greene, Helen C. Greene, and Advanced Petroleum Technologies, Inc., (APT).

(2) Motion to compel the Trustee to accept or reject executory contract filed by Boyd B. Greene, Janis M. Greene, Helen C. Greene, and APT; a response having been filed by the Trustee.

(3) Motion filed by the Trustee for authority to enter into agreement; to approve executory contract; and for an expedited hearing; a response

having been filed by Helen C. Greene and APT.

(4) Motion for protective order filed by Helen C. Greene and APT; a response having been filed by the Trustee.

Pursuant to the joint request of the parties, all testimony and exhibits from previous hearings in this bankruptcy case will be incorporated into the record for the purpose of considering the aforementioned pleadings. The court, following a review of all of these matters, including the testimony presented at the most recent hearings, hereby finds as follows, to-wit:

### I.

The court has jurisdiction of the parties to and the subject matter of these proceedings pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. These are core proceedings as defined in 28 U.S.C. § 157(b)(2)(A), (B), and (O).

### II.

An involuntary Chapter 11 bankruptcy petition was filed against the debtor, Nu–Corp International Technologies, Inc., (Nu–Corp), on October 14, 2005. An agreed order for relief, approved by the petitioning creditors and Nu–Corp, was entered on February 14, 2006. In conjunction therewith, a second agreed order consenting to the appointment of a Chapter 11 Trustee was entered February 28, 2006, which resulted in the appointment of the Trustee on March 13, 2006.

The above captioned adversary proceeding, which was styled a complaint for injunctive relief, declaratory judgment, and damages, was filed on October 28, 2005, by the petitioning creditors, Judy C. Jones, Richie M. Young, Garland L. Smith, Shawn Charystal, A.E. Laird, and Craig Marshall, against Boyd B. Greene; Janis

Moore Greene; Helen C. Greene, individually, and in her capacity as vice president of Nu–Corp and as president of APT; Nu–Corp; APT; William Hawkins and James Martin Greene, in their capacities as officers and/or directors of Nu–Corp. This adversary proceeding has narrowed considerably into a dispute between the Chapter 11 Trustee, acting for the benefit of Nu–Corp, on one side and Boyd B. Greene, Helen C. Greene, and APT on the other. The dispute focuses on the right to use certain intellectual property invented and patented by the Greenes.

It is undisputed that Boyd B. Greene and his daughter, Helen C. Greene, both of whom are mechanical engineers, applied for a patent applicable to a Compound Curvilinear Crude Oil Recovery Unit, commonly known as the XpaK System. The patent was issued on January 18, 2005, and bears U.S. Patent No. 6,843,832 B2. The inventors are designated as Boyd B. Greene and Helen C. Greene. Boyd Greene assigned his interest in the XpaK System patent to APT, but Helen Greene has not done so.

Nu–Corp was incorporated to be the manufacturing and marketing entity for the XpaK System. APT was formed to own the intellectual property developed by the Greenes, but, as noted hereinabove, Helen Greene has never assigned her interest in the patent to APT. Initially, there was a great deal of cooperation between these two corporations, as well as, the various individuals that were serving as their respective officers and directors. At one time, Helen Greene was the president of APT and the vice president of Nu–Corp. While he was never an officer of Nu–Corp, Boyd Greene was employed by Nu–Corp as a consultant. He also invested substantial sums of money in the incorporation

and the operations of Nu–Corp. At the time of the filing of Nu–Corp's bankruptcy case, William Hawkins was its president and James Martin Greene was its secretary-treasurer.

In an effort to attract investors, Nu–Corp developed a business plan entitled "Nu–Corp International Technologies, Inc., Business Proposal," dated September, 2001. (Trustee's Exhibit 1, August 23, 2006 hearing)[1] In addition, Nu–Corp developed a promotional brochure entitled "150,000 GPD Refined Oil Recovery Unit." (Trustee's Exhibit 2) In the brochure's Patents and Trademarks section, the following information was disclosed:

> The main component of XpaK system, the High–Rate Compound Liquid/Liquid/Vapor Separator, is currently patent pending. The flow process and other main parts of the XpaK separator system will follow and be patented in the United States. Nu–Corp has exclusive manufacturing and marketing rights to these patents through a JV agreement with APT. Nu–Corp is authorized to solicit government R & D grants for improvement of these technologies, and can authorize sales of technology to interested parties with APT's approval. In addition, our JV agreement also articulates that Nu–Corp has first right of refusal to all technologies/processes developed and patented through APT (Chapter 9, Intellectual Properties).

As will be seen hereinbelow, parts of this statement do not comport with the legal realities.

Nu–Corp worked through Mississippi State University to develop a prototype of the XpaK System. On July 10, 2003, a press release was issued through the University Relations News Bureau describing

---

1. Unless noted otherwise, all exhibits referred to in this Opinion are those received in evidence and numbered at the August 23, 2006 hearing.

the successful testing of the XpaK System by Mississippi State University, calling it an environmentally friendly oil-water separation system that could increase petroleum production and save millions of dollars in recovery costs. (Nu–Corp Exhibit 2, January 31, 2006 hearing)

All of the promotional activities resulted in the investment of substantial sums of money into Nu–Corp by numerous individuals who became stockholders in the corporation. Unfortunately, there was an embezzlement scheme perpetrated against Nu–Corp which depleted a sizeable amount of the invested funds. This embezzlement is presently being investigated by the Federal Bureau of Investigation, but, as yet, there have been no indictments or arrests. The court has no reason to believe that either Boyd Greene or Helen Greene was involved in the scheme in any way whatsoever. Indeed, the testimony has indicated that the parties involved in the embezzlement also misappropriated monies from Boyd Greene's personal checking account. Because of his personal financial difficulties, Boyd Greene has been compelled to file an individual Chapter 13 bankruptcy case. Where the money has gone is still a mystery, but, suffice to say, neither Nu–Corp nor Boyd Greene have any of it. At a recent hearing, Robert Alvarez, an attorney who assisted in the organization of Nu–Corp, informed the court that Nu–Corp was significantly under capitalized from the outset and that substantial funds were simply overspent during the promotional and organizational activities.

Coupled with the foregoing is the additional misfortune that there are numerous individual stockholders who now have nothing to show for their investment.

Conceptually, the business relationship between Nu–Corp, APT, and the Greenes was extremely promising. There was an excellent product idea, a marketing strategy, and what appeared to be available "start-up" funds. The embezzlement scheme and the resulting mistrust that erupted among the parties contributed to the deterioration of the relationship. Ultimately, the total lack of funds brought the relationship to a stalemate.

The subject pleadings call upon the court to define the respective rights of the parties. Needless to say, this is not a pleasant or a simple task.

### III.

A major problem for the court is the quality of the documentation, introduced into evidence, that underpins the contractual relationship between Nu–Corp and APT. The few documents that do exist appear to have been prepared by lay persons without the assistance of legal counsel. As such, they are not models of clarity in defining the rights or responsibilities of the parties.

The first document, entitled "Letter of Intent," is dated May 10, 2001. It was executed by Boyd B. Greene on behalf of APT and Judy C. Jones on behalf of Nu–Corp. (Trustee's Exhibit 5, December 15, 2006 hearing) John Sill, the initial president of Nu–Corp, testified that this document was accepted by Nu–Corp at a board of directors meeting held on November 16, 2001. (APT Exhibit 1) (These minutes are discussed in more detail hereinbelow.) The first two paragraphs of the Letter of Intent provide the following:

> It is the intent of Advanced Petroleum Technologies, Inc. of Byhalia, Mississippi to allow Nu–Corp International Technologies, Inc. based in Byhalia, Mississippi the exclusive rights to market any and all patented inventions by Advanced Petroleum Technologies, Inc. both foreign and domestic.

Nu–Corp International Technologies, Inc. will pay Advanced Petroleum Technologies, Inc. a licensing fee based on the fee structure set out by Advanced Petroleum Technologies, Inc. for each unit. It will be the duty of Nu–Corp International Technologies, Inc. to pass this fee on to their customers along with other value added items and solutions.

This document could best be described as an "agreement to agree." The document does indeed recite an intent on the part of APT to allow Nu–Corp to have *exclusive* rights to market any and all patented inventions developed by APT. It does not identify the XpaK System, nor does it expressly delineate the amount of consideration that is to be paid by Nu–Corp to APT for these rights. Although Boyd Greene testified that he did not have the corporate authority to execute this document on behalf of APT, this is of no significance since the document has little, if any, contractual binding effect. It also was never signed or ratified by Helen Greene, the sole stockholder of APT, and the co-owner of the XpaK System patent. At best, this document serves merely as a pointer to the document that will be addressed in the following paragraph.

The second document, which is an actual agreement signed by Nu–Corp and APT, is labeled "AGREEMENT/PROPOSAL between APT Inc. & Nu–Corp International Technologies Inc. For Use of Intellectual Properties, Date: 9–18–2001." (Trustee's Exhibit 3) It addresses the execution of a *non-exclusive* license for the intellectual property rights applicable to the XpaK System. The following paragraphs are excerpted:

1. The Sum of $495,000.00 dollars due upon completion and execution of Non–Exclusive License for the Compound Curvilinear Crude Oil Recovery Unit. This shall stipulate a non-

compete provision within the agreement.

3. Licenses fee of $20,000.00 dollars shall be paid for each foreign patent required to protect the intellectual property rights for international marketing requirements based on existing U.S. Patents.

4. A Royalty of 3 1/2% shall be paid to APT for any and all equipment sold using the patented or copyrighted systems, devices or methods. These monies are due at time of sale.

A significant part of this agreement is the consideration of $495,000.00, which was payable to APT upon the completion and execution of a non-exclusive license for the XpaK System. At an earlier hearing, John Sill, identified earlier, testified that the $495,000.00 was to be paid to APT upon the consummation of a transaction with the Republic of China. However, since this was not successfully completed, he indicated that the consideration for the use of the XpaK System technology was to be paid through future revenues generated from Nu–Corp's operations. This deferred consideration proposal was disputed by both the Greenes and APT who asserted that the full consideration was long past due. In support of this position, APT introduced into evidence an invoice to Nu–Corp, No. 1021, dated October 1, 2002, which reflects a billing for the marketing rights for the fuel oil recovery system in the sum of $495,000.00. (APT Exhibit 3) APT's contention is also substantiated by the financial records maintained by Nu–Corp which reflect that the sum of $495,000.00 was designated as a license fee. (APT Exhibits 9 and 10, December 15, 2006 hearing)

While the September 18, 2001, document is certainly no paragon of contractual drafting, in the opinion of the court, it is by far the most effective effort of Nu–Corp

and APT to reduce their agreement to writing. It "fleshes out" and supercedes through novation the Letter of Intent dated May 10, 2001. Nu–Corp recognized the efficacy of this document through its own financial records, as well as, through the testimony of several witnesses who acknowledged the applicability of the 3 1/2% royalty provision.

Also introduced into evidence were minutes of a Nu–Corp board of directors meeting held on November 16, 2001. (APT Exhibit 1) Two significant entries appearing in these minutes are set forth as follows:

> "We voted in the Letter of Intent between APT, Inc. and Nu–Corp International Technologies, Inc."

> "We decided to have a non-compete agreement with APT, Inc."

John Sill testified that the Nu–Corp minutes were referring to the Letter of Intent dated May 10, 2001. His testimony, however, was disputed by that of Helen Greene who testified that the minutes were referring to the later agreement dated September 18, 2001. While the minutes clearly state "Letter of Intent," it is not illogical to presume that the more recent September 18, 2001 agreement was being addressed, particularly since Nu–Corp began to disclose in its financial statements the $495,000.00 license fee that would be owed to APT. In addition, the September 18, 2001 agreement corresponds more closely in time to the date of the board meeting, and it mentions the non-compete provision which is also noted in the corporate minutes.

Another document of interest is a letter from APT to Nu–Corp, dated October 20, 2005, signed by Helen Greene as president of APT. (APT Exhibit 4) This letter proposes to outline the terms for an *exclusive* license agreement between APT and Nu–Corp for the XpaK System and the potential purchase of Patent No. 6,843,832. It calls for an immediate payment of $150,000.00 to APT with twenty-three subsequent monthly payments of $10,000.00. The proposed purchase price for the patent is the sum of $8,500,000.00. The final paragraph in the letter provides as follows:

> These terms will be outlined in a contractual, non-transferable, license agreement if agreed upon by the Board of Directors. We would like to have a response in 14 days from receipt of this letter, if Nu–Corp is interested in proceeding with contract.

Although this appears to be a proposal to modify the September 18, 2001 agreement, the court has seen no evidence that it was ever accepted by Nu–Corp. Also, there has been no payment of any part of the required consideration by Nu–Corp to APT. Consequently, the court can attach little significance to this document since it appears to be only an unaccepted offer.

■ At the several hearings that have occurred during the pendency of this bankruptcy case, Nu–Corp has advanced the argument that it should have an exclusive right to utilize the XpaK System technology as opposed to a non-exclusive right. Both the May 10, 2001 Letter of Intent and the letter from APT, dated October 20, 2005, certainly fuel this argument, but neither have contractually binding effect. The only agreement that would appear to have any legal viability is the agreement dated September 18, 2001. Regardless, there has been no consideration paid by Nu–Corp to APT that would bind APT even to this agreement. No alternative agreement has been reached that would permit the $495,000.00 license fee to be paid on a deferred basis from future revenues. No license has been reduced to writing and tendered to Nu–Corp. Succinctly stated, Nu–Corp cannot continue to maintain its claim to the XpaK System

technology, whether it be an exclusive or non-exclusive right, without paying an "agreed upon" consideration.

IV.

█ Section 365(a) and Section 365(b)(1)(A), (B), and (C), provide as follows:

(a) Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default *other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;*

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

Since the court has determined that neither the May 10, 2001 Letter of Intent nor the APT letter, dated October 20, 2005, contain the necessary ingredients to constitute binding contracts, insofar as § 365(b) is concerned, the court can look only at the September 18, 2001 Agreement/Proposal. While it obviously has shortcomings, it is the only agreement, admitted into evidence, that could possibly be considered an executory contract. Neither Nu–Corp nor the Chapter 11 Trustee can promptly cure the default that exists in this agreement by paying APT the required $495,000.00 license fee. Quite frankly, it does not appear that Nu–Corp or the Chapter 11 Trustee can pay APT any reasonable consideration that would be necessary to obtain an exclusive or non-exclusive right to utilize and thus "tie-up" APT's and/or Helen Greene's XpaK System technology. Consequently, the court deems the September 18, 2001 agreement between Nu–Corp and APT to be rejected. As such, any materials, information, documents, etc., relating to the patent and technology must be returned by Nu–Corp, as well as, any of its officers, directors, or shareholders, to APT and/or Boyd B. Greene and Helen C. Greene. Nu–Corp is precluded from utilizing this technology in the future.

V.

In addition to the prototype built and tested at Mississippi State University, Nu–Corp built and sold an XpaK System to Federal Express for the approximate sum of $285,000.00. APT made demand upon

Nu–Corp for the royalty payment of 3 1/2% of the net sales price as provided in the September 18, 2001 agreement. The Trustee had these funds in her possession, but, prior to making any distribution of the royalty payment, she requested authorization from this court to do so. Following discussions between the Trustee and the attorney representing APT and the Greenes, the court permitted the Trustee to pay the royalty to APT and Helen Greene in the total sum of $9,975.00, which represented a royalty of 3 1/2% of the aforesaid net sales proceeds. (See Court order dated November 28, 2006.) If there were other components, unrelated to the XpaK System technology that were included in the transaction, the court was not sufficiently apprised of the value of those components in order to make an appropriate reduction in calculating the amount of the royalty payment.

## VI.

■ At the conclusion of the hearing conducted on December 15, 2006, the petitioning creditors, represented by Attorney Toni Campbell Parker, and Attorney Robert Alvarez, who was involved in the formation of Nu–Corp, requested permission to submit a joint written memorandum. The court, seeking any assistance available, acceded to this request.

In their memorandum, the petitioning creditors and Alvarez advanced the theory of "implied license," asserting that through a pattern of conduct that APT and Helen Greene had extended an exclusive license to Nu–Corp to utilize "worldwide manufacturing, sales and marketing rights to the intellectual property rights and patented process represented by and described in United States Patent No. 6843832." This theory had not been pled or otherwise argued by anyone heretofore.

In support of this theory, they cited the case of *Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc.*, 103 F.3d 1571 (Fed.Cir.1997), cert. denied 522 U.S. 818, 118 S.Ct. 69, 139 L.Ed.2d 30 (1997), which delineated the requirements of an implied license by conduct as follows:

1. A relationship between the patent holder and the licensee exists.
2. Within the relationship, the patent holder grants the licensee a right to use the invention.
3. The patent holder receives valuable consideration for that grant of a right.
4. The patent holder denies the licensee an implied license.
5. The patent holder's conduct and statements create an impression that the patent holder consents to the licensee's making, using, or selling the patent holder's patented inventions.

103 F.3d at 1579.

The petitioning creditors and Alvarez contend that the development of the XpaK System prototype at Mississippi State University and the sale of the X–XpaK System to Federal Express meet *Wang Laboratories'* requirement number 3 that the patent holder has received valuable consideration for the granting of the implied license. The court disagrees with their assessment. The testimony indicated that the development of the prototype was a "team" effort orchestrated by Boyd Greene with the participation of Dow Chemical, Mississippi State University, and Nu–Corp. In the opinion of the court, the undertaking of this experimental project does not translate into the receipt of valuable consideration by the patent holders. As to the sale of the X–XpaK unit to Federal Express, the Chapter 11 trustee for Nu–Corp's bankruptcy estate received the sales proceeds less the 3 1/2% royalty

paid to APT and Helen Greene. Consequently, a "valuable consideration," such as the $495,000.00 license fee, contemplated in the September 18, 2001 agreement, sufficient to merit the extension of an implied license, has never been paid by Nu–Corp to the patent holders.

The petitioning creditors and Alvarez assert that a binding relationship between Nu–Corp and APT was formed and memorialized in the 2001 Business Proposal which was developed by Nu–Corp for dissemination to potential investors. The court mentioned the 2001 Business Proposal (Trustee's Exhibit 1) hereinabove, as well as, the promotional brochure (Trustee's Exhibit 2), both of which discussed a prospective relationship between Nu–Corp and APT. At the same time that these documents were being generated, the parties were also attempting to formalize their contractual relationship through such documents as the September 18, 2001 agreement. This latter document cannot be ignored. It carries much more weight in defining a legally binding relationship between Nu–Corp and APT than either the 2001 Business Proposal or the promotional brochure.

The 2001 Business Proposal and the promotional brochure were expressions of what Nu–Corp and APT hoped to accomplish. The September 18, 2001 agreement structured their contractual relationship. The implied license theory fails, just like the contractual relationship fails, because Nu–Corp has never paid "valuable consideration" in any reasonable amount for the right to utilize the technology described in the patent.

## VII.

The Trustee recently filed a motion for authority to enter into a proposed Distribution Agreement with Enviro–World Solutions, LLC, a Mississippi Limited Liability Company. Several selected paragraphs in this agreement are excerpted immediately hereinbelow: (Nu–Corp is referred to as "Company")

WHEREAS, Company has the exclusive worldwide manufacturing and rights in the Technology (as described herein) and has developed a substantial body of technology, technical information, forms and plans necessary and useful in the manufacture and distribution of the Products (as described herein);

WHEREAS, Company is in bankruptcy proceedings in the matter of *In Re: NuCorp International Technologies, Inc.,* Case No. 05–19490, Chapter 11, in the United States Bankruptcy Court for the Northern District of Mississippi, and does not have capital sufficient to manufacture, distribute and sell the Products;

WHEREAS, Distributor and Company have agreed that it is necessary that Distributor control all manufacture and distribution of the Products and future development of the Products to achieve the goals of the Parties hereunder;

WHEREAS, Distributor and Company has agreed that it is necessary that Distributor have access and control over all of the Technical Information developed by Company and acquired by Company and that those rights be protected by this Agreement; and

1.2 "APT Agreement" shall mean the agreement between APT and Company that grants to Company the exclusive worldwide marketing and manufacturing rights in the Technology as approved in the Bankruptcy Proceedings.

1.9 "Patent" shall mean United States Patent and Trademark Office patent # 6,843,832 for a Compound Curvilinear Separator and all divisions or continuations thereof, additions or amendments thereto, reissues or exten-

sions or reexaminations of such patent, and any foreign patent or patent application corresponding to said U.S. Patent.

2.2   Company hereby agrees to provide Distributor with all Improvements in and to the Products or Technical Information.   Company hereby grants to Distributor all of the rights of the Company under any agreement, including, without limitation, the APT Agreement and any other agreement with Boyd Greene, Helen Greene or APT to produce, use, market and sell any and all Improvements in and to the Products and Technical Information.

5.   *CONTINGENCIES*.  Distributor's obligations under this Agreement are contingent upon all of the following conditions having been met at or prior to Closing unless waived in writing by Distributor prior to Closing:

5.1   The terms of the APT Agreement shall be set forth in an order of Judge Houston in the Bankruptcy Proceedings and approved by the Distributor.

5.4   Helen Greene and Boyd Greene shall have irrevocably assigned all of their rights in the Patent to APT or all of their rights in the Patent are determined by the Court in the Bankruptcy Proceedings to be assigned to APT pursuant to terms of the APT Agreement.

8.1   Distributor shall pay to Company the cash sum of $600,000 in consideration for Company's transfer of the Xpak System located at Mississippi State University, goodwill, customer information and vendor information to Distributor and all other rights and considerations set forth in this Agreement. Said $600,000 payment shall be made as follows:  (a) $125,000 shall be paid at Closing;  and (b) the remaining $475,000 shall be paid upon entry of an order by the Court in the Bankruptcy Proceedings approving a Chapter 11 plan that incorporates this Agreement into the Chapter 11 plan.   Distributor may allocate such consideration as Distributor determines.  If Company cannot deliver good title to the XpaK separator system and other property described in Section 3 hereof free and clear of liens and encumbrances and Distributor waives the contingency set forth in Section 5.3 hereof, the payment of $475,000 shall be reduced by $125,000.

16.   *RIGHT TO ENFORCE APT AGREEMENT.*   Distributor shall have the right to perform all rights of Company set forth in the APT Agreement, including the filing of any foreign patents or enforcement of the rights of Company against APT.  Additionally, Distributor shall have the right to take such actions, including payment of any royalty or other amount due under the APT Agreement from amounts due to Company hereunder as Distributor in its sole discretion determines is necessary to perform its obligations hereunder. Distributor shall file all foreign patents relating to the Patent at its own expense to the extent such right is granted to Company under the APT Agreement. Additionally Distributor shall have all rights under Section 14 hereof.

The Distribution Agreement seems to be a viable concept to salvage Nu–Corp and perhaps even APT, Boyd Greene and Helen Greene.  The court is confident that the principal of Enviro–World Solutions, LLC, has the financial means, expertise, and ability to perform this agreement.  However, the Distribution Agreement is premised on Nu–Corp having the exclusive right to utilize the intellectual property owned by APT and Helen Greene.  As set forth hereinabove, Nu–Corp has been unable to pay any consideration to APT or

Helen Greene for this right, exclusive or otherwise. There is no evidence that any other negotiations have ripened into a binding contract for the use of the intellectual property. Consequently, the Distribution Agreement, even though it appears to be an excellent proposal and one that could work for the best interests of everyone, is simply a "non-starter" because of the failure of this basic premise. Therefore, unless an agreement can be reached concerning the use of the technology by Nu–Corp, the Trustee's motion to enter into the Distribution Agreement must be denied.

An order will be entered consistent with this opinion contemporaneously herewith.